```
          IN THE UNITED STATES DISTRICT COURT FOR THE
                   EASTERN DISTRICT OF OKLAHOMA
```

| | |
|---|---|
| TONY C. MORK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CIV-06-395-KEW |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Tony C. Mork (the "Claimant") requests judicial review of the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Claimant's application for disability benefits under the Social Security Act. Claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled. For the reasons discussed below, it is the finding of this Court that the Commissioner's decision should be and is AFFIRMED.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . ." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do

his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . ." 42 U.S.C. §423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. *See*, 20 C.F.R. §§ 404.1520, 416.920.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. Hawkins v. Chater, 113 F.3d 1162, 1164 (10th Cir. 1997)(citation omitted). The term "substantial evidence" has been interpreted by the United States Supreme Court to require "more than a mere scintilla. It means such relevant

---

[1] Step one requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921. If the claimant is engaged in substantial gainful activity (step one) or if the claimant's impairment is not medically severe (step two), disability benefits are denied. At step three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to step four, where claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's step four burden is met, the burden shifts to the Commissioner to establish at step five that work exists in significant numbers in the national economy which the claimant – taking into account his age, education, work experience, and RFC – can perform. Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. *See generally,* Williams v. Bowen, 844 F.2d 748, 750-51 (10th Cir. 1988).

evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court may not re-weigh the evidence nor substitute its discretion for that of the agency. Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991). Nevertheless, the court must review the record as a whole, and the "substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); *see also*, Casias, 933 F.2d at 800-01.

### Claimant's Background

Claimant was born on September 10, 1961 and was 44 years old on the date of ALJ's decision. He received his GED and completed one additional year of collegiate education. Claimant previously worked as a facility supervisor, quality control inspector, tow truck driver, dump truck driver, and route driver. Claimant alleges an inability to work beginning October 16, 2002, due to fibromyalgia, hypertension, and depression.

### Procedural History

On April 9, 2003, Claimant filed for disability insurance benefits under Title II (42 U.S.C. § 401, *et seq.*) of the Social Security Act. Claimant's applications for benefits was denied initially and upon reconsideration. A hearing was conducted by ALJ

John Volz on January 17, 2006. Thereafter, the ALJ denied benefits in a decision rendered January 27, 2006. On June 3, 2006, the Appeals Council denied review of the ALJ's findings. Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

### Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. He determined that while Claimant's medical conditions were severe, they did not meet a Listing and Claimant retained a residual functional capacity ("RFC") to allow him to perform light work, which included his past relevant work as a facility supervisor and quality control inspector.

### Errors Alleged for Review

Claimant asserts the ALJ committed error requiring reversal in failing to (1) engage in a proper credibility analysis; (2) failed to properly evaluate Claimant's mental impairments; and (3) failed to order a consultative mental examination.

### Credibility Analysis

Claimant challenges the ALJ's rejection of his testimony based upon the lack of credibility. Claimant's injuries originated from an automobile accident that occurred in 1988 or 1989, from which Claimant suffered a fractured femur, injury to his right heel, and back injuries which required two lumbar laminectomies. (Tr. 209). In August of 1996, Claimant suffered another lower back injury

while lifting at work. (Tr. 135). In May of 1997, Claimant suffered a low back strain while lifting a tank from an upper shelf at work. (Tr. 132). X-rays in indicated a forty percent loss of disk space at L5 with an anterior compression fracture of indeterminate age. The x-rays also revealed disk space narrowing at L4-L5 and L5-S1 consistent with degenerative disk disease. (Tr. 194).

Claimant engaged in physical therapy in June of 1997. An MRI indicated he had marked post-operative dural ectasia from the L4 level to the sacrum with extensive epidural fibrosis and probable tethering of the spinal cord at the S1-S2 level. (Tr. 182). Claimant was discharged from physical therapy in October of 1997, with the therapist noting Claimant had missed several appointments, lacked motivation, and made little progress. (Tr. 122). In October of 1998, Claimant was released to work by Dr. Robert Brownsberger.

In January of 2000, Claimant was attended by Dr. Layne Jorgenson, reporting fatigue, insomnia, diarrhea aggravated by stress, weight gain, general body aches, decreased libido, and frequent respiratory infections. (Tr. 313). Dr. Jorgenson diagnosed Claimant with chronic fatigue, depression, insomnia, and non-cardiac chest pain for which he was prescribed Prozac and Trazodone. (Tr. 310). In March of 2000, Dr. Jorgenson noted Claimant's depression had "significantly improved." (Tr. 307).

In June of 2000, Claimant reported low back pain which Dr. Jorgenson diagnosed Claimant with lumbar strain, persistent with lumbar dysfunction. (Tr. 305). Dr. Jorgenson prescribed Vioxx/Celebrex and manipulation, which produced "excellent results." Id.

Claimant returned to Dr. Jorgenson in October of 2000, complaining of lower back pain after cutting wood. Dr. Jorgenson found Claimant to suffer from lumbar strain. (Tr. 302).

In December of 2000, Claimant was referred to Dr. William Maier for constant generalized muscle and joint pain in his legs, arm, upper and lower spine, and neck. Dr. Maier diagnosed Claimant with "possible fibromyalgia." (Tr. 209). Dr. Maier also found Claimant to possibly be suffering from post traumatic stress syndrome as a result of the automobile accident in which he was injured. He continued Claimant's treatment with Zoloft and Darvocet. He also recommended aerobic training. (Tr. 210). Throughout 2001, Claimant saw Dr. Jorgenson for treatment of his fibromyalgia pain.

In March of 2002, Claimant was referred to Dr. Anthony Glassman, reporting diffuse, chronic pain. Dr. Glassman found Claimant "exhibits no pain behavior. He can dress, sit, stand, and turn without difficulty. He can squat and recover 100%. . . . Cervical range of motion is within normal limits." Dr. Glassman also found upper extremity strength and lower extremity strength

was "5/5." He noted lumbar range of motion of 60 degrees flexion, 25 degrees extension, 25 degrees bilateral bending, 10 degrees bilateral rotation. Claimant ambulated with normal reciprocating gait, could heel walk and toe walk without difficulty. Claimant was tender at the levators and trepezius as well as rhomboid musculature. He was also tender in the chest, hips, lateral epicondryles and medial knees. Dr. Glassman diagnosed Claimant with fibromyalgia, depression, and insomnia secondary to fibromyalgia and prescribed a variety of medication. (Tr. 245).

Dr. Glassman also saw Claimant in April of 2002. He found Claimant was experiencing 50% relief in his pain symptoms, was better able to interact with his family members, was working a 40 hour week without problem, was driving, and experienced good sleep. He concluded Claimant suffered from "fibromyalgia, improved." (Tr. 243).

In July of 2002, Claimant complained of ankle pain. Dr. Glassman found Claimant had an old healed calcaneal fracture with mid to anterior aspect deformity and loss of Bohler's angle. However, he noted no arthritic changes or abnormalities of the ankle joint itself. Dr. Glassman diagnosed Claimant with sub-tailor impingement secondary to loss of Bohler's angle due to old calcaneal injury. (Tr. 233). In September of 2002, Claimant was referred to Dr. Brian Hayes, who diagnosed Claimant with a right ankle peroneal tendinitis. (Tr. 219). However, Dr. Hayes stated

7

he had no further treatment to add to Claimant's regimen other than what had already been prescribed by Dr. Glassman. Id.

On October 1, 2002, Claimant returned to Dr. Glassman complaining of ankle and back pain and "fibromyalgic symptoms" after he lifted a dishwasher. Dr. Glassman diagnosed Claimant with right peroneii tendonitis, lumbar strain, and fibromyalgia. (Tr. 230-231). Claimant returned to Dr. Glassman on October 29, 2002 reporting a 50 percent improvement in his ankle pain and a resolution to his back pain. Claimant still complained of fibromyalgic pain, exacerbated by his loss of his job and demonstrated by positive trigger points. (Tr. 228). Claimant also saw Dr. Jane Bolduc on October 30, 2002 complaining of his fibromyalgic pain, erectile dysfunction, and elevated blood pressure. (Tr. 276). Claimant also saw Dr. Bolduc in March and April of 2003 with lumbar strain from lifting and fibromyalgia. Dr. Bolduc prescribed Neurontin, Oxycodone and Percocet, Flexeril and Celebrex as well as physical therapy. (Tr. 273-274).

In June of 2003, Claimant's medical records were reviewed by Karen Bates-Smith, PhD., a non-examining state agency psychologist. She determined Claimant suffered from non-severe depression and anxiety with only mild restrictions to his activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or

pace. (Tr. 249-251).

On July 8, 2003, Claimant again was attended by Dr. Bolduc, who noted Claimant reported pain from fibromyalgia, which was only partially helped by Neurontin and not helped by Ultram. (Tr. 272). Claimant reported he was irritable and depressed with insomnia. Claimant was prescribed Lexapro, Hydrochlorothiazide, Zanaflex, Neurontin, and Trazodone. Id. Claimant continued to complain of high blood pressure, fibromyalgia, and depression in July of 2003. (Tr. 266). Claimant reported to Dr. Bolduc in an August 28, 2003 visit that he "sleeps well," "feels less depressed," and "enjoys life more." Dr. Bolduc noted Claimant "smiles easily," his affect was "pessimist," and he was "slightly depressed." (Tr. 265).

Claimant also saw Dr. Bolduc in October of 2004. Dr. Bolduc noted Claimant was "much better than in 2002. (Tr. 264). Claimant reported, however, that he "feels miserable" despite taking his medication. Claimant also told Dr. Bolduc he had not seen a pain specialist or refill his blood pressure medication because of a lack of funds. Dr. Bolduc noted Claimant was alert and smiles but that he still suffered from fibromyalgia and was suspected of experiencing depression. (Tr. 263).

Claimant's records were examined by an agency psychologist, Peter LeBray, PhD. in November of 2003. Dr. LeBray found Claimant

suffered from depression, which would present mild restrictions of of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 319-320). Dr. LeBray found Claimant's alleged "near total disability" due to fibromyalgic pain and depression "are not consistent with his described ADLs and are only partially consistent with medical evidence." (Tr. 322). Dr. LeBray completed a Mental Residual Functional Capacity Assessment form with regard to Claimant. Dr. LeBray concluded Claimant was moderately limited only in the areas of the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to interact appropriately with the general public. (Tr. 323-325). Dr. LeBray found no impairment in this category but suggested guidance as to job goals and advised vocational support. (Tr. 326).

At subsequent visits with Dr. Bolduc (the date of which is obscured in the record submitted to the Court), Claimant still complained of fibromyalgic pain but was noted to be doing better and was able to do more activities around the house. Again, Claimant was found to be alert, with fluent speech, a pleasant affect, no hallucinations, and sat up with shoulders straight. (Tr. 261-262).

In February of 2005, Claimant was attended by Dr. David

10

Dryland. He concluded Claimant was suffering from fibromyalgia and osteoarthritis. (Tr. 340). At both the February, 2005 and an April, 2005 visit to Dr. Dryland, Claimant's mood was found to be normal, he was alert and oriented and his memory was intact. (Tr. 333, 340). Claimant was prescribed Requip and "was feeling somewhat better" on the drug in a July, 2005 visit to Dr. Dryland. However, he suffered stress from his parents' divorce which made his condition worse. (Tr. 344). Claimant then moved to Oklahoma.

Claimant saw Dr. Ahmer Hussain in November of 2005 and January of 2006 after moving to Oklahoma. Dr. Hussain found Claimant's fibromyalgia was "stable." (Tr. 13-14).

Claimant testified that his fibromyalgic condition made him feel like he was getting the flu. He suffers extreme fatigue, as well as constant joint and muscle pain. (Tr. 371). He rated his pain as 7 out of 10 and that he could only sit for 10 minutes and stand for 10 minutes and walk up to 100 yards at a time. (Tr. 378-380). He also stated he suffered from insomnia and PTSD. (Tr. 374, 379-380). He can lift and carry a 30 pound bag of dog food about 40 feet. (Tr. 368-369).

Claimant testified he was fired from his last employment as a quality control inspector at a horse trailer manufacturing plant due to excessive absences. (Tr. 366, 370, 375). He stated his he could not imagine what he would feel like if he was not on his medications. (Tr. 371-372). He stated the pain was constant,

11

lasting 24 hours per day and traveled to the spots on his body he injured in the automobile accident. (Tr. 373). He sometimes shoots basketballs with his children. (Tr. 374). He mainly watches television and reads books while sitting at home. (Tr. 381-382).

In his decision, the ALJ was not persuaded Claimant's impairments were as severe as he alleged. He found Claimant functioned "fairly well even with his fibromyalgia." (Tr. 24). He found his pain had been reduced with treatment and that his joints were found to be stable and he had good range of motion. Id. He noted Claimant participated in basketball with his children, which belied Claimant's statements that he need to sit after 10 minutes of walking. He also found this latter testimony "was not compatible with his observed behavior during the hearing." Id. The ALJ found Claimant retained the residual functional capacity for light work. Relying upon the testimony of the vocational expert, the ALJ determined Claimant could return to his past relevant work as a facility supervisor or quality control inspector. (Tr. 25).

It is well-established that "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). "Credibility determinations are peculiarly in the province of the finder of fact" and, as such,

will not be disturbed when supported by substantial evidence.  <u>Id</u>.
This Court concurs with the ALJ's evaluation of the credibility of
Claimant's statements concerning the level of his disability in
light of the objective medical evidence in the record.  While
Claimant's conditions are clearly debilitating, they are not
disabling to the extent of preventing him from performing his past
relevant light work.  The ALJ has sufficiently linked references to
the medical record with his findings of credibility to satisfy his
obligation under this analysis.  Thus, this Court finds no error in
his evaluation of credibility.

**Evaluation of Claimant's Mental Impairments**

Claimant also contends the ALJ failed to properly consider
Claimant's mental impairments.  Claimant contends the ALJ failed to
properly relate his conclusions regarding Claimant's mental
impairments with medical evidence in the record.  He also asserts
the ALJ failed to consider evidence which contradicted his
findings.

The ALJ recognized Claimant's position that his depression
also constituted a disabling condition.  However, the ALJ found the
medical record contained no mental health treatment records,
evidence of psychiatric hospitalizations, but that Claimant does
take anti-depressant medications.  (Tr. 23).  The ALJ noted the
requirement that he evaluate Claimant's mental impairments in
conformity with the special technique contained in the Social

13

Security regulations. The ALJ found Claimant's depression would not significantly affect his ability to engage in work related activities, noting the agency assessments of the restrictions imposed by Claimant's mental condition. Id.

The ALJ is required to follow the procedure for determining mental impairments provided by regulation. 20 C.F.R. §§ 404.1520a, 416.920a; *See*, Listing of Impairments. The procedure must be followed for the evaluation to be considered valid. Andrade v. Sec. of Health & Human Services, 985 F.2d 1045, 1048 (10th Cir. 1993). The ALJ must first determine whether there are medical findings of mental impairment especially relevant to the ability to work found in Part A of the Listing of Impairments. 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The ALJ must then either evaluate the degree of functional loss resulting from the impairment, using the Part B criteria, or examine the special criteria set forth in the listings for evaluating the severity of particular impairments. The ALJ's analysis tracks the requirements of these regulations. The ALJ reviewed the record and determined that Claimant received effective treatment for his depression and anxiety and sought no psychiatric hospitalizations. The fact Claimant's condition is well-controlled with medication belies any claim that his depression and anxiety is disabling. *See*, Moss v. Barnhart, 2004 WL 296982, 2 (10th Cir. (Kan.)); Medina v. Barnhart, 2003 WL 21313253, 2 (10th Cir. (N.M.)).

Moreover, no medical evidence in the record would indicate Claimant's functional ability to work has been affected by his depression and anxiety. The medical records of Drs. Bolduc and Dryland both indicate marked improvement in Claimant's depression and anxiety throughout the course of treatment with the introduction of appropriate medications.

Claimant makes much of the failure of the ALJ to address his "irritability" in the decision. While Claimant's personal relationship with his children may have been affected by irritability early in the diagnostic period for his condition, nothing in the record indicates this attitude would have markedly affected his ability to work. In short, the record does not support a finding that Claimant suffered from a severe mental impairment, warranting a reversal of the ALJ's findings.

Claimant also finds error in the ALJ's failure to employ a consultative mental examiner to assess Claimant's RFC. The ALJ has a duty to fully and fairly develop the record as to material issues. Baca v. Dept. of Health & Human Servs., 5 F.3d 476, 479-80 (10th Cir. 1993). To serve that end, the ALJ has broad latitude in ordering consultative examinations. Hawkins v. Chater, 113 F.3d 1162, 1166 (10th Cir. 1997). If a conflict in the medical evidence exists or if that evidence is inconclusive, a consultative examination may be required. Id. In this case, the medical record is replete with references and testing of Claimant's depression and

anxiety by competent treating physicians. Further consultative examinations were not required for the ALJ to properly evaluate Claimant's mental condition and its effect upon his ability to work. Having found the ALJ's decision to be well-supported, this Court concludes reversal and remand is not required.

### Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. Therefore, this Court finds the ruling of the Commissioner of Social Security Administration should be and is **AFFIRMED**.

DATED this 25th day of January, 2008.

_____
KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE